Although Dr. Burrows opined, and the other expert medical witnesses would assume, that much wrist and arm motion for any purpose would cause symptoms (i.e., pain), there is no convincing evidence that the level of activity in which the plaintiff actually engaged while supervising her sons on cleaning jobs following her employment with the defendant augmented the underlying occupational disease condition to any degree, "however slight". Consequently, the defendants were on the risk during her "last injurious exposure to the hazards of such disease." N.C. Gen. Stat. § 97-57.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good ground to reconsider the evidence, the Full Commission MODIFIES the Opinion and Award of the Deputy Commissioner and enters as its own the following Opinion and Award.
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act.
2. The employee-employer relationship existed between plaintiff and defendant-employer.
3. Lumbermen's Mutual Casualty Company was the compensation carrier on the risk.
4. Plaintiff's average weekly wage was $272.64.
The parties also stipulated to three pages of Dr. Naso's notes.
* * * * * * * * * *
Based upon all the competent credible evidence of record, the Full Commission makes the following
FINDINGS OF FACT
1. Plaintiff is 35 years old. She attended school to the tenth grade and never had any problems with her hands before going to work for defendant-employer in May 1990 as a packer.
2. Plaintiff's job as a packer required her to use her hands in a repetitive motion by picking up bags of potato chips between her fingers, palms down, and lifting the bags up level with the top of her head and packing them into boxes. She would then pick up the boxes, weighing between three and five pounds and stack them. Plaintiff assembled all the boxes she packed, and depending on the size of the bags of potato chips, the plaintiff would pack anywhere from 400 to 1,200 boxes per night. She used her hands, wrists and arms constantly at this job, moving her hands from a palm up to palm down position eight hours a day, five days per week. This was a production job, so speed was important.
3. On October 30, 1992 plaintiff developed the sudden onset of numbness in her hands while packing big bags of potato chips at work. This problem persisted over the weekend and she was sent by defendant-employer to Dr. Warren B. Burrows II the following Monday. Thereafter, plaintiff was unable to earn the same wages with the defendant or any other employer in competitive employment.
4. Despite normal nerve conduction studies, Dr. Burrows attributed plaintiff's complaints to carpal tunnel syndrome and performed bilateral releases on or about December 15, 1992. Plaintiff experienced tingling and weakness and burning wrist pain following surgery. Around the middle of January of 1993, plaintiff tried unsuccessfully to return to work on light duty, working scrap which required pinching packages and then using a razor. Upon trying this light duty of picking scraps, she developed a recurrence of numbness in both wrists.
5. At plaintiff's request, she returned to her regular packing job instead of light duty on or about February 9, 1993. Soon thereafter, she began to experience coolness and numbness in her hands as well as a drawling sensation and sharp pains on the ulnar side of her wrist. At that point, on March 18, 1993, Dr. Burrows recommended that she be put on light duty "opening scrap."
6. Opening scrap involves picking up packages of crackers with the left hand and using a razor in the right hand to open the package and dump the crackers out. Plaintiff's hand still intermittently became cold and went numb with any use and she did not work after March 24, 1993. When plaintiff visited Dr. Burrows April 12, 1993, he decided to keep her "off work" until she could see Dr. Stephen J. Naso, Jr., for a second opinion
7. Plaintiff saw Dr. Naso April 20, 1993, on which occasion Dr. Naso saw no reason that plaintiff should not be able to continue in a light duty capacity, and he recommended that she return to work the next day.
8. Plaintiff was justifiably unhappy with her recurring disability under the treatment and management of Dr. Burrows, and the second opinion of Dr. Naso. On her own, she sought treatment from Dr. William Alan Ward at the Miller Orthopaedic Clinic. Plaintiff first saw Dr. Ward on March 25, 1993, and requested Industrial Commission approval for his treatment within two months. Dr. Ward's records show that he excused plaintiff from work beginning March 25, 1993.
9. Dr. Ward diagnosed median compression neuropathy caused by pronator teres syndrome. He recommended that plaintiff work in a light duty capacity avoiding all lifting, pulling, pushing, and carrying greater than ten pounds, as well as any job involving repetitive motion. Dr. Ward specifically recommended against picking or packing scrap.
10. The light duty job of picking peanuts or chips involved sitting at a conveyer belt visually observing peanuts as they came by and picking out the bad ones. This was not a production job and plaintiff could work at her own pace. However, Dr. Ward, opined that there would be some threshold number of repetitions where plaintiff would start to get symptoms and he doubted she could tolerate many repetitions. He thought that if she worked, she would need to change work assignments throughout the day.
11. Defendant-employer offered plaintiff the picking job, but she refused. Dr. Ward, the doctor of her choosing who had assumed her care and treatment, had specifically advised her not to perform the picking job, as recorded in his March 25, 1993 patient notes. Plaintiff had suffered pain and disability after periods of recommended "light work" in November, 1992 and January, 1993, and thus had lost confidence in Dr. Burrows. Consequently, plaintiff's refusal of this work was justified.
12. Defendant-employer continued to pay plaintiff her regular wages through February of 1993. In May of 1993 defendant-employer sent plaintiff three checks for accumulated vacation leave which were not plaintiff's regular wages. Plaintiff was terminated by defendant-employer effective May 13, 1993.
13. Under Dr. Ward's care, plaintiff underwent conservative treatment, then median neurolysis with pronator release for the right and then the left arm. Plaintiff noted significant improvement following these procedures and reached maximum medical improvement on April 20, 1994, with a 10% permanent impairment to each arm. She was released to light to moderate work activity involving no repetitive motion.
14. In March or April 1993 plaintiff became employed by Timberland Homes, mostly supervising her teenage sons who did most of the cleaning of new modular homes. Once in a while, plaintiff would dust furniture or maybe clean a window or door. They worked five to six hours a day at least two times a week. Plaintiff had to do this because she did not have any income, and she had to take her oldest son out of school to help her out economically. Plaintiff received a check from Timberland for her sons' work until one son turned 18 years old on February 3, 1994, and then the check was made out to him. The Timberland fees started at $123.00 per week and went to $125.00 per week. However, this was joint labor, and, but for her sons, plaintiff would not have made this money at all. The Timberland Homes experience is not evidence that plaintiff could get or successfully perform a job.
15. Plaintiff apparently also attempted some housecleaning with her sister, because she reported to Dr. Frederick E. Pfeiffer on June 23, 1993 that after about two hours of this kind of work, she developed severe numbness in her hands. She also told Dr. Ward in January 1994, when she was still cleaning homes, that she was having problems with coolness after repetitive work. Although plaintiff experienced the above symptoms, Dr. Ward had never seen anybody in his nine years of practice with pronator syndrome from housecleaning. Neither did he believe that plaintiff's employment with Timberland Homes significantly contributed to the development or progression of the median nerve compression that he diagnosed in March of 1993.
16. Dr. Ward did not observe any changes in plaintiff'scondition from March of 1993, when he first examined her, until he performed surgery on her on October 29, 1993, and, again, on January 28, 1994. Dr. Burrows did not observe any significant change in plaintiff's condition from March of 1993 until he last saw her in September of 1993.
17. The treatment that plaintiff received from Dr. Ward and Dr. Pfeiffer was reasonable and necessary to effect a cure and give relief.
18. Plaintiff's employment with defendant-employer placed her at an increased risk of developing median compression neuropathy, caused by pronator teres syndrome, as compared to members of the general public not so employed, and, in fact, caused or was a significant contributing factor to her development of that condition.
19. Plaintiff's employment involving the cleaning of homes did not proximately augment her occupational disease to any degree, however slight; nor did it place her at an increased risk of developing this condition; nor was it a significant contributing factor in the development of the disease.
20. At the time of the onset of plaintiff's occupational disease, her average weekly wage was $272.64, yielding a compensation rate of $181.76 per week.
21. Due to causes and conditions characteristic of and particular to her employment with the defendant, plaintiff suffers from a compensable occupational disease. As a result of her occupational disease, plaintiff is incapable of earning the same wages she earned before in the same or any other employment, through the date of hearing before the Deputy Commissioner.
* * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. Due to causes and conditions characteristic of and particular to her employment with the defendant, plaintiff suffers from a compensable occupational disease within the meaning of N.C. Gen. Stat. § 97-53 (13), and is entitled to temporary total disability benefits from the onset of her illness on October 20, 1992, through the date of the hearing on April 22, 1994, and continuing until plaintiff obtains employment or further orders of the Industrial Commission, with a credit to defendants for any wages paid to plaintiff during this period. Defendants shall receive dollar-for-dollar credit for these wage payments, because they were made prior to July 5, 1994, the effective date of the 1994 amendment to N.C. Gen. Stat. § 97-42. N.C. Gen. Stat. § 97-29. People v. Cone MillsCorp., 316 N.C. 426, 437, 438, 342 S.E.2d 798 (1986);Evans v. ATT Technologies, 332 N.C. 78, 88,418 S.E.2d 503 (1992).
2. Payments in lieu of vacation leave from defendant-employer in the form of three checks issued from February to May of 1993 shall not be credited against compensation due from the defendant-employer. Estes v. North Carolina StateUniv., 102 N.C. App. 52, 58, 401 S.E.2d 384 (1991).
3. Defendant is obligated to pay bills for medical services, and such other medical compensation as may tend to effect a cure, give relief, or shorten the period of disability resulting from plaintiff's occupational disease. N.C. Gen. Stat. §§ 97-25
and 97-2 (19).
4. As plaintiff obtained relief from the treatment of Dr. Ward, and moved timely for his approval, Dr. Ward should be approved as plaintiff's treating physician. N.C. Gen. Stat. § 97-25.
* * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay to plaintiff temporary total disability benefits at the rate of $181.76 per week for the period from October 20, 1992 through April 22, 1994, and shall continue to pay compensation thereafter until plaintiff obtains further employment or further orders of the Industrial Commission, subject to a credit to defendants for any wages already paid during this time period. Compensation accrued shall be paid in a lump sum, subject to the attorney fee hereinafter approved.
2. A reasonable attorney's fee of 33 and 1/3% of the compensation awarded is approved for plaintiff's counsel, including a lump sum from the accrued compensation and every third check coming due thereafter, and shall be deducted and paid directly to plaintiff's counsel for valuable services rendered.
3. Defendant shall pay the costs of medical compensation incurred by reason of the subject compensable injury, including those of Drs. Ward and Pfeiffer, when the bills for same have been submitted to, and approved by, the Commission. Dr. Ward is approved as plaintiff's treating physician.
4. Defendants shall pay the costs due this Commission.
 S/ _______________ J. RANDOLPH WARD COMMISSIONER
CONCURRING: S/ ___________________ THOMAS J. BOLCH COMMISSIONER
S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
JRW:md